IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:14cr397-006 |
| v. | |
| ASAF AKIVA IBRAHIMIAN | Honorable Anthony J. Trenga |
| Defendant. | Sentencing:  August 14, 2015 |

**DEFENDANT'S POSITION WITH RESPECT TO SENTENCING**

COMES NOW the defendant, Asaf Akiva Ibrahimian, by counsel, and in accordance with 18 U.S.C. § 3553(a), the remedial scheme set forth in *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Hughes*, 401 F.3d 540 (4th Cir. 2005), and respectfully submits his Position with Respect to Sentencing.  Mr. Ibrahimian worked as a sales representative for TC Medical Group for sixteen months beginning in September 2012.  He was 21 and had just graduated from college when Reuven Mills offered him the opportunity to work for TC Medical Group and move to Canada.  Before he started work, Mr. Ibrahimian was told that he would be selling orthopedic injections to doctors and clinics in the United States.  He understood that the injections were manufactured by U.S. drug manufacturers in FDA approved facilities and were intended for sale in foreign countries at deeply discounted prices.  He recalls being shown a website by one of his co-conspirators that matched lot numbers with the FDA approved facility where the drugs were manufactured.  For many years, U.S. drug manufacturers have sold large quantities of their drugs to other countries at greatly reduced prices.  These same drugs are reimported back into the United States and sold on the grey market to doctors and pharmacies in

1

the United States looking for ways to reduce the cost of providing prescription medications or increase their profit margins. This was the market Mr. Ibrahimian was tapping into. Together, Mr. Ibrahimian and Mr. Mirlis were responsible for combined sales of $716,019.09 – **less than 2.5 percent** of the more than $33 million in total sales attributable to TC Medical Group and SB Medical Inc. over the life of the conspiracy.

The Presentence Report calculated the defendant's Total Offense Level at 19 and his Criminal History Category as I with a resulting guideline range of 30 to 37 months imprisonment. Mr. Ibrahimian does not dispute the sentencing factors set forth in the Presentence Report (PSR ¶¶43-46, 48-52), however, he disagrees with the probation officer's conclusion that his activities were essential to the success of the conspiracy (PSR ¶ 39), and that he is not entitled to a downward adjustment for role in the offense (PSR ¶ 47). He also disagrees with the government that the guidelines as calculated provide the correct starting place for determining the appropriate sentence in this case.

For the reasons set forth below, Mr. Ibrahimian requests this Court apply a downward adjustment of 2 to 3 levels for mitigating role pursuant to USSG § 3B1.2, reducing his offense level to 16 or 17, and resulting in a recommended guideline range of either 21 to 27 months or 24 to 30 months. Mr. Ibrahimian further request this Court vary below the properly calculated guideline range and impose a sentence of probation that includes a condition of home detention. The government has filed a motion under USSG § 5K1.1 asking the Court to reduce the guidelines range for Mr. Ibrahimian by 50 percent to 15-18 months.

## I. The Offense Conduct

In August 2012, Shlomo Rabi came to visit Reuven Mirlis in New Jersey. During his visit, Mr. Rabi discussed his work in Canada selling orthopedic injections and the money he was

making working for TC Medical Group. Mr. Rabi offered to try to get Mr. Mirlis and Mr. Ibrahimian jobs and based on his recommendation, Tsvi Lexier agreed to hire Mr. Mirlis and Mr. Ibrahimian as sales representatives.

Tzvi Lexier and David Burke had been operating TC Medical Group and SB Medical Inc. since April 2011 with a staff of sales representatives and "drop shippers." SB Medical imported the drugs in to the country by shipping them from England to drop shippers at several locations in the United States. The drop shippers received the drugs shipments at their residences or at UPS boxes they opened under false names and waited for instructions from the sales representatives telling them where the drugs should be shipped.

Mr. Ibrahimian worked at TC Medical Group's offices in Toronto from September 2012 until August 2013. When they arrived in Toronto, he and Mr. Mirlis were told to create aliases for themselves and begin selling orthopedic injections. Mr. Ibrahimian received his instructions, including scripted sales pitches, from Shlomo Rabi and David Burke who the government has described as "gifted salesmen and master manipulators." *United States v. Rivka Rabi*, No. 1:15cr126, Position of the United States With Respect to Sentencing, Dkt. 22, p. 3. He does not deny disregarding the FDA regulations governing the sale of these products or misleading customers about where the products originated, although, as the government knows, some of his customers agreed to accept orders that were shipped from the United Kingdom.[1] He also admits keeping up the façade that he was an authorized pharmaceutical distributor for a U.S. based company. Although Mr. Ibrahimian willingly employed some deceptive sales tactics, he knew

---

[1] See *United States v. Asaf Akiva Ibrahimian,* Statement of Facts, Dkt. 64, p. 8, which states that "[o]n September 11, 2013, Mr. Ibrahimian circulated a document labeled "Adam and Daniel's list of whats needed for their clinics.docx" listing United States customers and whether they accepted shipments of drugs and devices shipped directly from the United Kingdom or indirectly through a drop location in the United States."

3

from research he and Mr. Mirlis conducted that the products they sold did not need "black box" safety warnings and did not need to be cold chained, or stored in professional warehouses with temperature or humidity controls like some of the cosmetic drugs being sold by other members of the conspiracy.

While Mr. Ibrahimian may have ignored many of the risks that Tzvi Lexier and David Burke created, the government has not claimed that the orthopedic injections were mishandled, or that their safety or effectiveness was compromised. Mr. Ibrahimian never knew that other sales representatives were selling chemotherapy drugs or drugs used to treat macular degeneration, and never received any of the dozens of emails referred to by the government in which other conspirators showed "a blatant disregard for the integrity of the cold-chain drugs and devices they distributed."[2] Government's Position on Sentencing, Dkt. 137 at 3. Although he knew that some of the pharmaceuticals had to be cold chained, he had no knowledge that drugs were frequently mishandled during shipping or storage, or that the drop shippers were repackaging wet or damaged boxes.

After several months, Mr. Ibrahimian became concerned about some of the shipping methods and the complications involved in getting orders delivered to his customers. He discovered that large drug orders were being broken up into smaller shipments to avoid detection at the border and that shipping services in the United Kingdom were being used to avoid scrutiny by Customs and Border Patrol and Immigration and Customs Enforcement. When he raised

---

[2] The emails described in Mr. Ibrahimian's Statement of Facts are typical of the kind of information he and Mr. Mirlis received from other members of the conspiracy. They involve updates about the supply of drugs coming from foreign countries, information about the shipping process, invoicing customers, and the transfer of proceeds from the United States to Canada. SOF, Dkt. 64, pp. 7-10.

these and other concerns, he was repeatedly told by David Burke and Tzvi Lexier that the business operated in the grey area, but was legal if it was done correctly.

In August 2013, Mr. Ibrahimian and Mr. Mirlis moved back to New Jersey. They continued selling orthopedic injections to TC Medical Group's customers until January 2014 when they decided it was time to part ways with the people in Canada. For his sixteen months as a sales representative, Mr. Ibrahimian earned commissions totaling $86,734.59.

**II.     Mr. Ibrahimian's Role in the Offense**

The government has provided the Court with a chart ranking the defendants' relative culpabilities which describes Mr. Ibrahimian as a member of SB Medical Group's sales staff who along with Reuven Mirlis and numerous uncharged co-conspirators engaged in deceptive practices under the direction of David Burke and Sholomo Rabi. They are ranked after Rivka Rabi as the next least culpable, although unlike Ms. Rabi, they did not mishandle of any of the cold-chained drugs and were similarly unaware of the scope or scale of the conspiracy's operations. Although the government considers Ms. Rabi to be the least culpable, she served as a drop shipper for at least two years, eight months longer than Mr. Ibrahimian. During that time, she received, stored and shipped over $4 million in misbranded drugs, approximately 12 percent of the conspiracy's gross proceeds. She was paid a salary of $54,821.

During the sixteen months he worked for TC Medical Group, Mr. Ibrahimian received $86,734.59 in commissions. Messrs. Ibrahimian's and Mirlis' combined commissions of $173,469 represent approximately $716,019.09 in gross revenue – or **less than 2.5 percent** of the $33 million in gross revenue generated over the life of the conspiracy. See *United States v. SB Medical Inc., and TC Medical Group*, Position of the United States with Respect to

Sentencing, Dkt. 135, p.1.  The gross revenue generated from Mr. Ibrahimian's individual sales is **less than 1.25 percent** of the sales generated by the conspiracy.

Under U.S.S.G. § 3B1.2, a district court must reduce the defendant's sentence if it finds that the defendant played a minimal or minor role in the offense.  A defendant is entitled to a four-level adjustment if his role was minimal, *see* U.S.S.G. § 3B1.2(a), and a two-level adjustment if his or her role was minor, but not minimal. *See* U.S.S.G. § 3B1.2(b).  If the defendant's role falls between those two descriptions, then a three-level adjustment is prescribed. *See* U.S.S.G. § 3B1.2.  A defendant seeking a downward adjustment for his minor role in the offense must prove that he is entitled to it by a preponderance of the evidence. *See United States v. Akinkoye,* 185 F.3d 192, 201-02 (4th Cir. 1999); *United States v. Sharp*, 927 F.2d 170, 176 (4th Cir. 1991).

The commentary to U.S.S.G. § 3B1.2 makes clear that these adjustments are aimed at defendants who are "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 *cmt., backg'd., Note* 3(A).  In determining whether the adjustments apply, the court not only looks at the defendant's conduct relative to the other defendants, but also at his conduct relative to the elements of conviction. *See United States v. Daughtrey,* 874 F.2d 213, 216 (4th Cir.1989). In doing so, the court is required to ask whether "the defendant's conduct is material or essential to committing the offense."  *United States v. Akinkoye*, 185 F.3d at 202.

Thus, while the determination of whether the defendant played a minor role depends in part on a comparison of his conduct with that of other participants, the "critical inquiry is ... not just whether the defendant has done fewer bad acts than his co-defendants, but whether the defendant's conduct is material or essential to committing the offense." *United States v. Pratt,* 239 F.3d 640, 646 (4th Cir.2001) (noting that a court must measure defendant's individual acts

and relative culpability against the elements of the offense) (citations omitted). It should be self-evident that sales amounting to 1.25 percent of the $33 million in proceeds made by the conspiracy are not material or essential to committing the offense.

The Commentary to U.S.S.G. § 3B1.2 provided additional guidance for when a defendant should receive a mitigating adjustment:

> A defendant who is accountable under 1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline. For example, a defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under 1.3 only for the quantity of drugs the defendant personally transported or stored is not precluded from consideration for an adjustment under this guideline.
>
> Likewise, a defendant who is accountable under § 1B1.3 for a loss amount under § 2B1.1 (Theft, Property Destruction, and Fraud) that greatly exceeds the defendant's personal gain from a fraud offense and who had limited knowledge of the scope of the scheme is not precluded from consideration for an adjustment under this guideline. For example, a defendant in a health care fraud scheme, whose role in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, is not precluded from consideration for an adjustment under this guideline.

U.S.S.G. § 3B1.2, *cmt., backg'd., Note* 3(A).

Application Note 3(C) further states that the determination of whether to apply subsection (a) or (b), or an intermediate adjustment, "is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case."

The government does not dispute that Mr. Ibrahimian's relatively low culpability. Under the totality of the circumstances, he is entitled to an adjustment under this guideline because he performed an extremely limited function as measured by his contribution to the overall profitability of the conspiracy and is being held accountable for a loss amount ($716,019.09) that greatly exceeds his personal gain. Like the example in Application Note 3(A), Mr. Ibrahimian had limited knowledge of the scope of the conspiracy or the type of profits obtained by TC

Medical. Nor did he willingly accept the public health risks created by his co-conspirators cavalier attitudes towards the safe shipping and storage of their products. While he eventually came to question the legality of selling imported pharmaceuticals without a license, the health risks created by his co-conspirators were not reasonably foreseeable from the false advertising and types of deception he and others engaged in. Not unlike Rivka Rabi, he worked from a location outside the hub of the conspiracy during the last five months that he was selling the orthopedic injections and did not observe the activities of the other defendants. Unlike Ms. Rabi, however, he withdrew from the conspiracy almost a year before anyone was arrested.

A reduction of either 2 or 3 levels for a mitigating role is also warranted even though he worked as a sales representative for a period of sixteen months. The government agreed that Rivka Rabi was deserving of a four level adjustment for minimal role Rabi although she worked as a drop shipper for twenty-four months. As the Fourth Circuit stated, "the critical inquiry is ... not just whether the defendant has done fewer bad acts than his co-defendants, but whether the defendant's conduct is material or essential to committing the offense." *United States v. Pratt,* 239 F.3d at 646. Mr. Ibrahimian's *de minimus* contribution to the overall financial success of the conspiracy makes it clear that his conduct was neither material, nor essential to committing the offense. A two or three level adjustment under U.S.S.G. 3B1.2 would result in a total offense level of 16 or 17, with corresponding guideline ranges of 21 to 27 months and 24 to 30 months.

### III. Application of Sentencing Factors

The Court is conversant with the landscape of the remedial sentencing scheme set forth in *United States v. Booker,* 543 U.S. 220 (2005) and *United States v. Hughes*, 401 F.3d 540 (4th Cir. 2005). As it was before November 1, 1987, this Court is once again charged with the traditional role of judging the unique defendant presently facing sentencing with no presumption of

reasonableness attaching to the Guideline range. *Gall v. United States*, 552 U.S. 38, 50 (2007) (reversing Court of Appeals and reinstating a probationary sentence where advisory guideline range was 30-37 months). After considering the properly calculated guideline range and the § 3553(a) factors, the Court must "impose a sentence sufficient, but not greater than necessary" to comply with the intent of § 3553(a). *Id*. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). Thus, after *Booker* and *Gall,* sentencing courts must impose the minimum sentence that is sufficient to accomplish the objectives of § 3553(a).

Having considered the § 3553(a) factors, the Court may find that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States,* 551 U.S. 338, 351 (2007). While the Court must begin its analysis by correctly calculating the advisory Guideline range, it is then free, in light of the other statutory sentencing factors, to disagree and to impose an entirely different sentence. *Id.,* at 350. Here, the most relevant § 3553(a) factors include:

1. the nature and circumstances of the offense and the history and characteristics of the defendant;

2. the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

3. the need to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant; and

4. the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

A sentence of probation that includes a condition of home detention is the appropriate in this case.

### A. The nature and circumstances of the offense.

The nature and circumstances of the offense have been adequately presented to the Court. The government attributes much more significance to the loss resulting from Mr. Ibrahimian's sales efforts than is warranted by the circumstances of the offense, or by the pecuniary harm caused by his conduct.

Loss under § 2B1.1(b)(1) is the greater of the actual or intended loss to the victims of the fraud. *See* U.S.S.G. § 2B1.1 *cmt*. (n. 3(A)). Actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense." See *cmt*. (n. 3(A)(i)). Intended loss means "the pecuniary harm that was intended to result from the offense …" See *cmt*. (n. 3(A)(ii)). Reasonably foreseeable pecuniary harm is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." See *cmt*. (n. 3(A)(iv)). In appropriate circumstances, a defendant's gain is used as an alternative measure of loss but only if there is an actual or intended loss that cannot reasonably be determined. See *cmt*. (n. 3(B)); *United States v. Chatterji*, 46 F.3d 1336, 1340 (4th Cir. 1995).

In *Chatterji*, the Fourth Circuit held that regulatory fraud in new drug applications to Food and Drug Administration (FDA), consisting of false statements in applications, did not automatically void any FDA approval of the drugs, so as to deprive them of market value. The court concluded that the loss could not reasonably be determined because the drugs, although technically misbranded, were "exactly what they purported to be: prescription drugs approved by the FDA, manufactured in a certain strength and dosage, producing the specified therapeutic benefits that FDA requirements were intended to ensure." *Chatterji,* 46 F.3d at 1341. The court

therefore held that it unreasonable for the district court to consider the company's gross sales as the measure of "loss" for sentencing purposes because the submission of technically incorrect testing information did not render the drug without value to customers. *Id.* at 1340–42. Similarly, the Fifth Circuit held that the district court was required to substitute the gain the defendant received in absence of evidence that either the FDA or customers of defendant's company suffered calculable loss as result of a scheme to import Mexican made drugs. *United States v. Haas*, 171 F.3d 259 (5th Cir. 1999); see also *United States v. Bhutani,* 266 F.3d 661, 663-64 (7th Cir.2001)(calculating loss based on the defendants' gain where defendants were convicted of adding a substance to an approved drug to mask the fact that the drugs had expired).

      For the same reason, it is unreasonable to gauge Mr. Ibrahimian's sentence by the gross amount of his sales. Notwithstanding public health risks created by importing misbranded pharmaceuticals into the United States, the government has been careful to avoid claiming that the orthopedic injections he sold were not safe, or that they did not produce the their intended therapeutic benefit, or that consumers did not receive what they bargained for – an FDA approved drug of known safety and efficiency.[3] Mr. Ibrahimian's customers were doctors and clinics who monitored their patients' safety and were familiar with the expected therapeutic values of the orthopedic drugs. He not only relied on the fact that they continued to place orders with him, it was reasonable for him to assume that they would not have continued to order the misbranded products if they and their patients were not satisfied with their therapeutic results.

---

[3] Compare. *United States v. Marcus*, 82 F.3d 606, 610 (4th Cir. 1996) (distinguishing *Chatterji* and holding that the defendant's modification to a drug formula that had the potential to affect the bioequivalence of the drug rendered the drug of unknown safety and efficacy).

Using Mr. Ibrahimian's personal gain of $86,734.59 as the measure of loss would result in a total offense level of 14 and guideline range of 15 to 21 months, and a sentence that more accurately reflects his true level of culpability.

### B. The history and personal characteristics of the defendant.

Mr. Ibrahimian was born in Israel, the youngest of three children. His parents were struggling to make ends meet as a result of an ill-timed investment in a wedding and bar mitzvah hall and the theft of the company's remaining assets by one of his father's business partners.

When he was 10 months old, his parents moved to the United States with the help of family members who loaned them money and provided them with housing in an uncle's basement. Mr. Ibrahimian's father sold Persian rugs with his older brother while his mother tried to find work cleaning homes. As a child Mr. Ibrahimian recalls his father "working like a horse" from early morning until late at night and his mother working at a local synagogue as a nursery school teacher.

As the son of immigrant workers, it was clear to his public school classmates that he came from a different background that made it hard for him to make friends. Mr. Ibrahimian spoke no English and came from an orthodox Jewish background making him the target of frequent laughter and ridicule during his younger years. Although he went to synagogue every Sabbath with his father, he had a hard time maintaining friendships with other children in the Jewish community who he only saw once a week. As he got older, Mr. Ibrahimian recalls his classmates becoming meaner and even less accepting of his differences, forcing him to do things like eating bugs and stealing the kippah (Jewish skull cap) he had decided to start wearing to school.

Over the next several years, Mr. Ibrahimian attended several Jewish day schools where he found it easier to make friends, and after the tenth grade, returned to public school. The

financial security his family began to enjoy was shattered after his mother was forced to sharply reduce the number of children she was caring for in a business she operated out of her home.

Mr. Ibrahimian met Reuven Mirlis during the year he spent in Israel after high school. During that year, they both decided that they wanted to become more religious. When he returned to the United States, Mr. Ibrahimian enrolled in community college until Mr. Mirlis returned from Israel and they began attending a yeshiva in Monsey, New York and Fairleigh Dickinson University, where they both enrolled in an accelerated program and graduated with honors.

Mr. Ibrahimian has earned money working in restaurants and the food service industry since 2005. He also sold ticket packages for professional sports teams for a year. In 2010, Mr. Mirlis got him a job working as a vendor at the kosher food stands he was managing at Yankee and Giants Stadiums. When Mr. Mirlis changed jobs, Mr. Ibrahimian took over his position managing the vendors stationed at the various sports arenas. At the age of 21, he also began interning at a day trading firm when Mr. Mirlis presented him with the opportunity to start working for TC Medical Group as a sales representative in Toronto.

Mr. Ibrahimian was taught by his parents to help his fellow man. The attached letters are consistent in describing his desire to help others and the community and the sacrifices he made to support his family (Exhibit 1). He was known to routinely work odd jobs to help support his parents and is said to have handled the burden with grace and diligence, foregoing the opportunity to join his friends because he was busy helping his parents. His family and friends all refer to him as "the person to call if you are in need because he cares for others before himself." His "selfless, overly generous, loving and caring personality" is uniformly seen by others as "unmatched and a true blessing." In short, he is seen as someone responsible,

dependable and a proactive member of society, who is always available without hesitation and sometimes at only a moment's notice.

In his short 24 years, Mr. Ibrahimian has earned the respect not just of his family and friends, but of many members of his community. He is known as an active contributor in the Jewish community and at his local synagogue, volunteering countless hours visiting the sick and helping mentally challenged children by playing and spending time with them. Others remark on the time he has spent volunteering as a veterinarian's assistant, Emergency Medical Technician and at the Saint Barnabas Medical Center, and on his involvement in helping those inside and outside his community in strengthening their religious heritage.

All, including Mr. Ibrahimian, recognize that he has made bad decisions. A friend has observed him to be "unreservedly despondent" in the knowledge of the injurious impact being imprisoned could pose for his family and his future. He has taken ownership of his mistakes and is credited for his ability to learn positive lessons from any situation and for moving forward in a positive manner, and for not making the same mistake twice.

### C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

The gravity of Mr. Ibrahimian's offense and the need for punishment are properly measured by the harm he caused to the health and safety of the users of the pharmaceuticals he sold and secondarily, to the members of the general public who are the intended beneficiaries of the FDA's system of regulating prescription medications. While Mr. Ibrahimian's deceptive marketing practices and disregard for the FDA's regulations are not to be condoned, they did not harm any identifiable consumer or prevent the doctors and clinics that purchased his products from providing safe and effective treatment to their patients. Under these circumstances, a

sentence of probation with a condition of home detention promotes respect for the law and appropriately reflects the seriousness of the offense.

By virtue of his arrest and guilty plea, Mr. Ibrahimian has already faced significant punishment and will continue to suffer the harsh punishment of loss of reputation. The irreparable harm that a felony conviction will have on his ability to obtain future employment will persist long after this Court imposes its sentence. The effects will likely be magnified by his inability to prove his past worth to future employers. So too, the consequences of a felony conviction on his life as a private citizen will be permanent.

As a result of his conviction, Mr. Ibrahimian and Mr. Mirlis are also required to forfeit $173,469.18, representing their combined commissions for the sixteen months they worked for TC Medical Group. His limited savings and current unemployment means that Mr. Ibrahimian will be paying a significant financial penalty for some time to come as punishment for his criminal conduct.

In *Gall*, the Supreme Court recognized an expanded definition of punishment, quoting with approval the district court's explanation that probation, rather than "an act of leniency" constitutes a "substantial restriction of freedom." 552 U.S. at 44. The district court noted that Gall would be required to comply with strict reporting conditions and would not be allowed to change or make decisions about "significant circumstances in his life." *Id*. The same restrictions will apply to Mr. Ibrahimian during any term of probation or supervised release.

### D. The need to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.

As a result of his youth and inexperience, Mr. Ibrahimian did not appreciate the risks that selling on the grey market posed. He was an unsophisticated novice when he was recruited by Shlomo Rabi, and was not aware that TC Medical Group was involved in criminal activity.

15

Even as he became concerned about the convoluted supply chain and problems he experienced in filling orders, he received assurances that if done correctly, selling grey market pharmaceuticals was legal. While Mr. Ibrahimian worked for TC Medical for sixteen months, he never played a role in devising the misleading sales tactics or became aware of the short-cuts that were being taken in shipping and storing the products. His eyes have been opened by the weight of this prosecution and the knowledge that several of the patients who used the cold chained products suffered serious adverse medical events. His agreement to cooperate with the government within days of being arrested offers further reason to believe that he fully appreciates the wrongfulness of his conduct and does not pose a risk to the public.

A sentence of confinement is reasonable only to the extent that it is necessary "to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to a given case." See e.g., *Graham v. Florida*, 560 U.S. 48, 72 (2011); *United States v. Edwards*, 595 F.3d 1004, 1017 n.9 (9th Cir. 2010) (stating that imprisonment is not "the only form of sentence that may effectively carry deterrent or punitive weight"). The determination of whether a sentence of confinement is necessary to afford adequate deterrence depends on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case. In this case, a sentence of probation with a condition of home detention sentence is sufficient to afford both general and specific deterrence and to protect the public from further crimes by Mr. Ibrahimian.

> **E. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

Mr. Ibrahimian's co-defendant, Hanoch David Stein, has submitted a sentencing memorandum which includes useful information about the sentences imposed on defendants in health care fraud cases in this district and in other jurisdictions. See *United States v. Hanoch*

*David Stein*, Dkt. 142, pp. 12-14. As pointed out by Mr. Stein's lawyers, although the facts of each case are different, defendants guilty of similar offenses have received sentences of probation:

- *United States v. Gallant Pharma Int'l., Inc.,* No. 1:13CR00130-001, 2014 WL 2573067 (E.D. Va. 2014) (defendant sentenced to probation for importation contrary to law, introducing misbranded drugs into interstate commerce and the unlicensed wholesale distribution of prescription drugs).

- *United States v. Harvey Whitehead*, Case No. 1:13-CR-130-7 (E.D. Va. 2014) (defendant sentenced to two years of probation for each offense of unlicensed wholesale of pharmaceuticals and of introducing misbranded drugs into interstate commerce to run concurrently with each other).[4]

- *United States v. Merriam*, Case No. 1:13-CR-370-1 (E.D.Va. 2014). (defendant, sales representative, sentenced to probation and a $10,000 fine for introducing misbranded drugs into interstate commerce in Gallant Parma case).[5]

- *United States v. Lisa Coroniti*, Case No. 1:13-CR-130-9 (E.D.Va. 2013) (defendant sentence to two years' probation for introduction of misbranded drugs).

- United States v. Patricia Durr, Case No. 1:13-CR-130-8 (E.D.Va. 2013) (defendant sentenced to two years' probation, with the special condition she serve six months of home detention for introduction of misbranded drugs).

---

[4] Whitehead was employed by Gallant Pharma International, Inc., which, like TC Medical, obtained authentic pharmaceuticals intended for sales overseas and illegally sold them to physicians in the United States. The products were similarly misbranded, maintained, and stored. The loss amount attributable to Whitehead was between $1 million and $2.5 million.

[5] The loss amount attributable to the defendant in this case was between $30,000 and $70,000.

Defendants in other jurisdictions have similarly received sentences of probation for this type of activity:

- *United States v. Vo*, Case No. 13-cr-0048 (W.D. Ky. 2013) (sentencing Kentucky physician to one year of probation and $50,000 restitution for knowingly importing non-FDA approved Canadian birth control and prescribing to patients).

- *United States v. David J. Fishman,* Case No. 13-mj-8016 (N.D. Ohio 2013) (sentencing an Ohio physician to one year probation for knowingly importing lower-cost, but identical, oncology drugs from a Canadian distributor for use in his practice).

- *United States v. Behe,* Case No. 12-cr-00009 (E.D. Mo. 2012) (sentencing a vice-president of a drug company to five years' probation for knowingly importing from a UK wholesaler cancer drugs, including cold-chain drugs).

- *United States v. Anthony Galea,* Case No. 10-cr-307 (W.D.N.Y. 2010) (sentencing a Canadian physician to one year probation for knowingly importing foreign human growth hormone and steroid, even though such treatments would be legal in Canada and the bottles retained the original foreign language labels).

- *United States v. Verhage, Orr and Biegert,* Case No. 13-cr-105 (W.D. Mich. 2013) (sentencing defendant pharmacists to no imprisonment and a $30,000 fine for knowingly receiving returned drugs from nursing homes and restocking them into other bottles that did not contain accurate lot numbers or expiration dates).

## IV.   Conclusion

For the reasons stated, Mr. Ibrahimian submits that a sentence resulting from a strict application of the guidelines principles would significantly overstate the seriousness of his

offense and would produce an unnecessarily harsh sentence. As a first-time offender, whose relative level of culpability is extremely low, Mr. Ibrahimian will be ill served by a sentence of imprisonment.

A sentence driven by the proceeds Mr. Ibrahimian's sales generated does not reflect his level of culpability, the manner in which he was manipulated by Tzvi Lexier and David Burke, the fact that information on the shipping and storage of cold chained products was intentionally withheld from him, or the inconsequential role he played in the financial success of the conspiracy. Viewed in this context, his use of a fake name and his misleading sales practices do not warrant a prison sentence, especially after his substantial assistance to the government is taken into account.

Accordingly, a sentence of probation with a condition of home confinement that is coupled with the agreed forfeiture of $173,469.18 will fulfill the goals of sentencing set out in 18 U.S.C. § 3552(a).

> Respectfully submitted,
>
> ASAF AKIVA IBRAHIMIAN
> By Counsel

/s/_____
Nina J. Ginsberg, Esquire
VSB # 19472
*Counsel for Defendant*
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
703-684-4333
703-548-3181 (Fax)
nginsberg@dimuro.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of August, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

I further certify that a copy was sent by e-mail to Kelly Smihal at Kelly_Smihal@vaep.uscourts.gov.

/s/ _____
Nina J. Ginsberg, Esquire
VSB No. 19472
*Counsel for Defendant Asaf Ibrahimian*
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
703-684-4333
703-548-3181 (Fax)
nginsberg@dimuro.com